**RUSHTON MINING COMPANY, Petitioner,**

v.

**Rogers C. B. MORTON, Secretary of the Interior, Respondent,**

**United Mine Workers of America, District No. 2, Local Union 1520, Intervenor.**

**Nos. 74–1703, 74–1704.**

United States Court of Appeals, Third Circuit.

Argued April 29, 1975.

Decided June 30, 1975.

Richard M. Sharp, and John R. Carfley, Sharp & Carfley, Philipsburg, Pa., for petitioner.

Carla A. Hills, Asst. Atty. Gen., Robert E. Kopp and Michael Kimmel, Appellate Section, Civil Div., Dept. of Justice, Washington, D. C., for respondent.

Joseph A. Yablonski and Steven B. Jacobson, Washington, D. C., Lloyd F. Engle, Jr., and Melvin P. Stein, Pittsburgh, Pa., for intervenor.

Guy Farmer and William A. Gershuny, Patterson, Belknap, Farmer & Shibley, Washington, D. C., for Bituminous Coal Operators Ass'n, Inc., amicus curiae.

Before VAN DUSEN, ADAMS and GARTH, Circuit Judges.

OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

Having exhausted its administrative remedies, the Rushton Mining Company

petitions this court, pursuant to 30 U.S.C.A. § 816(a) (1971),[1] to set aside two decisions of the Interior Board of Mine Operations Appeals, dated June 20 and June 27, 1974. In both decisions the Board determined that miners idled by § 814(b) withdrawal orders are entitled to partial compensation under the first two sentences of § 820(a), even if the § 814(b) orders were subsequently vacated. The petitioner believes these decisions to be inconsistent with the Federal Coal Mine and Health Safety Act of 1969, 30 U.S.C.A. § 801 et seq. (1971), and, even if consistent with that Act, to deprive the petitioner of property without due process of law. We disagree, and accordingly affirm both decisions of the Board.

Congress enacted the Mine Safety Act to protect the "most precious resource" of the mining industry, the miner. 30 U.S.C.A. § 801(a) (1971). To achieve that end, Congress directed the Secretary of the Interior to promulgate mandatory safety standards for coal mines, § 811(a). As part of the enforcement of these standards, Congress required authorized representatives of the Secretary to "make frequent inspections" of coal mines. § 813(a). If such an inspection reveals that "an imminent danger" exists, the Act requires the inspector to

" . . . determine the area throughout which such danger exists, and thereupon . . . issue forthwith an order requiring the operator of the mine or his agent to cause immediately all persons, except those referred to in subsection (d) of this section, to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such imminent danger no longer exists."

§ 814(a). If the inspector finds a violation of a mandatory health or safety

standard, which violation does not create an imminent danger, he fixes a reasonable period of time within which the mine operator must comply with the standard. The deadline may be extended, but when the inspector finds further extensions unwarranted, the Act requires him to

" . . . find the extent of the area affected by the violation and . . . promptly issue an order requiring the operator of such mine or his agent to cause immediately all persons, except those referred to in subsection (d) of this section, to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that the violation has been abated."

§ 814(b).

The issuance of a § 814 order, in turn, triggers other provisions in the Act. The mine operator becomes liable under the civil penalty provisions of § 819(a)(1). Under § 820(a), the operator is also required to compensate the miners idled by the withdrawal order. The compensation is limited to the wages due the miners for the balance of the shift during which they were idled and for four hours of the next shift, if it also was idled by the order. The miners may apply to the Board of Mine Operations Appeals for such compensation, § 815; 43 C.F.R. § 4.500(a)(1) (Rev. Ed. Oct. 1, 1974), which application will be heard by an administrative law judge, id. § 4.580. Under the same provisions, the mine operator may apply to the Board to vacate, modify, or terminate the withdrawal order.

The question presented by these petitions is whether the Board may order compensation under § 820(a) for miners idled by a withdrawal order which has been vacated subsequent to such loss of work. Two separate withdrawal orders are involved.[2] Events leading to the

1. Unless otherwise indicated, in all references to Code sections "30 U.S.C.A.—(1971)" will be implicit.

2. The chronology in the text is taken from the opinions of the administrative law judges who heard the cases, with some additional informa-

tion supplied in each case by the opinions of the Board of Appeals decisions. The petitioner has not challenged any of these findings of fact, which we find to be supported by substantial evidence and which, therefore, must form the basis of our opinion. 30 U.S.C.A. § 816(b) (1971).

first of the withdrawal orders began on September 15, 1970, when an inspector issued a § 814(b) notice of violation to the Rushton mine. He found the mine to be in violation of § 877(f)(1) and its implementing regulations, 30 C.F.R. § 75.1704–1, which require two separate and distinct escapeways from each working section of the mine. The mine had a "double compartment slope," the upper and lower decks of which were separated by incombustible materials, but the Bureau of Mines (now the Mine Enforcement and Safety Administration (MESA)) in 1970 had informally interpreted § 877(f)(1) as prohibiting the designation of the upper and lower decks of a double compartment slope as separate and distinct escape facilities. The time for abatement of the violation by construction of a man hoist facility in the intake air shaft was extended for two and one-half years, but on February 8, 1973, the inspector found that the time for abatement should no longer be extended and issued a § 814(b) withdrawal order. The order idled 29 miners, who lost $608.13 in compensable wages under § 820(a).

The union applied to the Board for the idled miners' compensation and the operator applied to the Board to vacate the withdrawal order. The administrative law judge, a member of the Hearings Division of the Office of Hearings and Appeals of the Department of the Interior, consolidated the two applications.[3] In a December 7, 1973, Decision and Order, he found that MESA had issued on February 15, 1973, a formal interpretation of § 877(f)(1) under which the Rushton Mine's double compartment slope became acceptable. He also found that the operator's designation of an air shaft as an escape facility on its maps, when in fact the shaft was inadequate for that purpose, was at the instigation of, and under the approval of, MESA. For these reasons, he vacated the § 814(b) notice and withdrawal orders. Nevertheless, he sustained the miners' claims for compensation of wages lost as a result of the withdrawal order on the ground that, even though the order was subsequently vacated, the inspector had acted in good faith, within the scope of his authority, and not *ultra vires*, in issuing the order.[4] The administrative law judge's compensation order was appealed to the Interior Board of Mine Operations Appeals by the operator; on June 20, 1974, the Board affirmed on the ground of its decision in *United Mine Workers v. CF&I Steel Corp.*, IBMA 187 (1974), aff'd, *CF&I Steel Corp. v. Morton*, No. 74–1390 (10th Cir., May 13, 1975).[4a] From that decision, the petitioner timely appeals to this court.

The second withdrawal order before us was issued under § 814(b) on September 8, 1972, after the petitioner had failed to comply with a § 814(b) notice issued on September 5, and modified on September 6, which had required the petitioner to correct the torque on certain roof bolts and to install additional roof bolts. As a result of the withdrawal order, eight miners were idled, becoming entitled to $159.94 in compensation under § 820(a). Rushton appealed the withdrawal order to the subdistrict office of the Bureau of Mines, which on September 11 sent two inspectors to investigate the matter. On September 13, the original inspector issued a notice vacating his September 8 withdrawal order, commenting only that it had been "issued in error."[5] The union applied to the Board for the idled miners' compensation. In a February 20,

---

3. The application resulting from the second withdrawal order is described at page 6 below.

4. The petitioner does not dispute the administrative law judge's findings of good faith conduct. See note 2, *supra*.

4a. The *CF&I* case is the only other circuit court of appeals decision on the issue whether vacation of a § 814 withdrawal order precludes § 820(a) compensation. As will appear presently, we are in agreement with the Tenth Circuit on the construction of § 820(a).

5. The petitioner does not aver that the order was issued other than in good faith, however.

1974, decision, the administrative law judge in the Hearings Division denied the application, but his decision was reversed by the Interior Board of Mine Operations Appeals on June 27, 1974. The Board relied on the *CF&I* case, *supra*, and also its June 20, 1974, decision with respect to Rushton Mining Company discussed above. From this decision also the petitioner timely appeals to this court.

██ We turn first to the petitioner's argument that the Board's decisions are inconsistent with the Act. Since it is central to the issue, we reproduce below the full text of § 820(a), adding for clarity of discussion "[1]," "[2]," and "[3]" to what we take to be the main divisions of the section:

"(a)[1] If a coal mine or area of a coal mine is closed by an order issued under section 814 of this title, all miners working during the shift when such order was issued who are idled by such order shall be entitled to full compensation by the operator at their regular rates of pay for the period they are idled, but for not more than the balance of such shift. If such order is not terminated prior to the next working shift, all miners on that shift who are idled by such order shall be entitled to full compensation by the operator at their regular rates of pay for the period they are idled, but for not more than four hours of such shift. ██ If a coal mine or area of a coal mine is closed by an order issued under section 814 of this title for an unwarrantable failure of the operator to comply with any health or safety standard, all miners who are idled due to such order shall be fully compensated, after all interested parties are given an opportunity for a public hearing on such compensation and after such order is final, by the operator for lost time at their regular rates of pay for such time as the miners are idled by such closing, or for one week, whichever is the lesser. [3] Whenever an operator violates or fails or refuses to comply with any order issued under section 814 of this title, all miners employed at the affected mine who would be withdrawn from, or prevented from entering, such mine or area thereof as a result of such order shall be entitled to full compensation by the operator at their regular rates of pay, in addition to pay received for work performed after such order was issued, for the period beginning when such order was issued and ending when such order is complied with, vacated, or terminated."

The miners' claims for compensation arise under clause [1]. Rushton argues that this clause has no application, however, on the ground that it presupposes, *sub silentio*, the issuance of a valid withdrawal order. Three bases are relied on to support this conclusion. First, Rushton and the Bituminous Coal Operators' Association, as amicus curiae, rely on the ordinary definition of "vacate," drawn from Black's Law Dictionary, which is to render the order vacated "void *ab initio.*" Second, they argue that the Board's decisions have the effect of holding Rushton liable without fault for the acts of the Government's agent, which, it is said, is a conclusion contrary to the common law rule and should only be sustained on the basis of clear congressional language or unequivocal legislative history. For this they cite *Missouri Ry. Co. v. Ault*, 256 U.S. 554, 41 S.Ct. 593, 65 L.Ed. 1087 (1921). Finally, they argue that the Board's decisions are unsupported by the purposes of the Act.

Despite the ordinary definition of "vacate," we believe that § 820(a) on its face indicates that Congress intended to provide limited compensation to miners in the situations presented by these petitions. Reading § 820(a) in its entirety, one sees that clause [1] concerns withdrawal orders issued under § 814(a) or (b); clause [2] concerns withdrawal orders which the inspector has certified, under § 814(c)(1), to be caused by "an unwarrantable failure of [the] operator to comply with . . . mandatory health or safety standards; " and clause [3] concerns situations in which the oper-

ator "violates or fails or refuses to comply with any order issued under" § 814. Compensation of idled miners varies with the three situations covered by the three clauses. Miners idled by § 814(a) and (b) withdrawal orders are entitled under clause [1] to compensation for the balance of the shift during which the withdrawal order was issued, and half of the next shift, if that shift also was idled. Where there has been a § 814(c)(1) certification, clause [2] provides the basis for giving the idled miners full compensation up to one week, but only after a hearing and after the withdrawal order has become "final." If the operator fails to comply with the withdrawal order, clause [3] gives the miners double compensation for the time during which they should have been idled, through the point at which the withdrawal order is "complied with, vacated, or terminated."

We believe that it is clear that in drafting § 820(a) Congress understood the difference between an order which is ultimately upheld and one which is ultimately vacated, that in clause [2] Congress intended to compensate miners only where the order is ultimately upheld, but that in clauses [1] and [3] Congress intended to compensate miners even where the order is ultimately vacated. Any other reading of the section would be inconsistent with the section's overall design, since it would ignore the fact that clause [2] explicitly predicates compensation on the order's being held valid after a hearing, whereas clauses [1] and [3] have no such requirement.

Also, this reading furthers the goal of mine safety. As stated in *Freeman Coal Mining Co. v. Interior Bd. of Mine Op. Appeals*, 504 F.2d 741, 744 (7th Cir. 1974):

> "Since the Act in question is a remedial and safety statute, with its primary concern being the preservation of human life, it is the type of enactment as to which a 'narrow or limited construction is to be eschewed.' *St. Marys Sewer Pipe Co. v. Director of United States Bureau of Mines*, 262

F.2d 378, 381 (3d Cir. 1959). Rather, this court must interpret the Act liberally in light of its primary purpose." The miners themselves are uniquely situated to perceive dangerous conditions in time to avert tragic, and often fatal, accidents. By giving them compensation—albeit very limited—for work lost as the result of withdrawal orders, § 820(a) encourages the miners to report dangerous conditions. See *Phillips v. Interior Bd. of Mine Op. Appeals*, 500 F.2d 772, 778 (D.C.Cir. 1974). For the same reason, it removes a potential impediment to the inspector's actually issuing withdrawal orders.

The petitioner argues, however, that the above interpretation of § 820(a) renders "Pyrrhic" the victory of a mine operator who succeeds in having a withdrawal order vacated on appeal, and therefore frustrates the congressional purpose in creating a system of administrative appeals in § 815. With this we cannot agree. As we have seen, the operator's liability for idled miners' wages is not the sole consequence of a withdrawal order. Other consequences are, for example, the necessity of abating the condition giving rise to the order and the possibility of civil liability under § 819. An appeal which enables the operator to avoid these expensive consequences could hardly be labeled "Pyrrhic"; on the contrary, it removes what may well be the more serious consequences of the withdrawal order.

■ The interpretation of a statute by the administrative agency to which Congress entrusted its enforcement is entitled to great weight. See *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Power Reactor Co. v. International Union of Electrical Workers*, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961). In the case before us, the Board's interpretation of § 820(a) is not only consistent with the legislative policy of the statute, it is also the natural reading of the plain words of the section in question. Accordingly, we affirm the Board's interpretation of clause [1] of § 820(a) as allowing limited com-

pensation even when the § 814(b) withdrawal order is subsequently vacated.

■■■ The petitioner next contends that the above result deprives it of property without due process of law, in violation of the Fifth Amendment to the United States Constitution. While sedulously avoiding the phrase, the petitioner's argument endeavors to resurrect the theory of substantive due process which the Supreme Court abrogated some 30 years ago. See *Dean v. Gadsden Times Pub. Co.*, 412 U.S. 543, 544, 93 S.Ct. 2264, 37 L.Ed.2d 137 (1973); *Lincoln Union v. Northwestern Co.*, 335 U.S. 525, 535–37, 69 S.Ct. 251, 93 L.Ed. 212 (1949). The modern conception of due process requires only that the means chosen by Congress be reasonably related to a legitimate legislative end. By requiring mine operators to compensate miners idled by withdrawal orders, § 820(a) is similar to a Missouri statute under review in *Day-Brite Lighting, Inc. v. Missouri*, 342 U.S. 421, 72 S.Ct. 405, 96 L.Ed. 469 (1952). In *Day-Brite*, the statute required employers to compensate workers who were required to leave work in order to vote. The Court said:

> "The only semblance of substance in the constitutional objection to Missouri's law is that the employer must pay wages for a period in which the employee performs no services. Of course many forms of regulation reduce the net return of the enterprise; yet that gives rise to no constitutional infirmity. [Citing cases.] Most regulations of business necessarily impose financial burdens on the enterprise for which no compensation is paid. Those are part of the costs of our civilization. Extreme cases are conjured up where an employer is required to pay wages for a period that has no relation to the legitimate end. Those cases can await

decision as and when they arise. The present law has no such infirmity. It is designed to eliminate any penalty for exercising the right of suffrage and to remove a practical obstacle to getting out the vote. The public welfare is a broad and inclusive concept. The moral, social, economic, and physical well-being of the community is one part of it; the political well-being, another. The police power which is adequate to fix the financial burden for one is adequate for the other. The judgment of the legislature that time out for voting should cost the employee nothing may be a debatable one. It is indeed conceded by the opposition to be such. But if our recent cases mean anything, they leave debatable issues as respects business, economic, and social affairs to legislative decision. We could strike down this law only if we returned to the philosophy of the *Lochner, Coppage* and *Adkins* cases."

*Day-Brite, supra* at 424–25, 72 S.Ct. at 408. The *Day-Brite* holding was reaffirmed verbatim in *Dean v. Gadsden Times Publishing Co., supra.*[6]

Section 820(a) endeavors to protect the "physical well-being" of coal miners, and through their safety, the "economic . . . well-being" of the mine operators themselves. Both purposes were recognized as valid in *Day-Brite, supra.* Section 820(a), clause [1], pursues those ends by reducing the economic impact of withdrawal orders on coal miners, who are in the best position to report dangerous mine conditions. See *Phillips, supra* at 778. It does not insulate the miners from loss due to withdrawal orders; the miners must bear the loss of their wages after the first one-and-one-half shifts idled by a withdrawal order. Rather, it distributes the loss between miner and operator in the manner Congress appar-

---

**6.** The petitioner also advances the emotionally appealing argument that the Board's interpretation of § 820(a) gives operators no protection against "mischievous" or malicious abuse of the withdrawal order procedure by vindictive inspectors. As the Supreme Court said in

*Day-Brite*, the resolution of such a case can await the day such abuse actually occurs; as noted above, it is conceded that the inspectors acted in good faith in both orders before us. See notes 4 and 5, *supra.*

ently decided was the most equitable means of achieving mine safety. It would be a usurpation of the legislative function if this court were to frustrate the Congressional distribution of loss and instead impose our own conceptions of equity. The cost of compensation under § 820(a) is, we believe, no different in constitutional status than other costs made necessary by the safety measures which the statute requires mine operators to take. Just as a withdrawal order may ultimately be vacated, the construction of a safety device may ultimately prove to have been unnecessary if the Secretary revises his safety regulations.[7] But this possibility is no argument against enforcement of the safety regulations; nor is it any argument for nullifying § 820(a).

Insofar as the petitioner raises issues of procedural due process, his arguments are inapposite. As noted above, the petitioner is entitled to a hearing of the miners' claims for compensation before an administrative law judge, with appeal to the Board of Appeals, and review in this court. He does not seek more thorough procedures, but wishes to interpose a defense, which was proscribed by Congress, against the miners' claims. For the reasons given above, we believe that in creating the idled miners' right to compensation, Congress may constitutionally disallow the defense of an invalid underlying withdrawal order.[8]

In other respects as well, the statute affords the mine operators full administrative due process. See *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Mattern v. Weinberger*, 519 F.2d 150, Opinion of June 3, 1975 (3d Cir.).

Accordingly, we conclude that the decisions and orders of the Board are valid. The petitions for review will be denied. Costs shall be taxed against the petitioner.

---

7. In fact, this is exactly what happened in the first order under review. The original order required the construction of emergency hoisting facilities at the air shaft; this proved to be unnecessary after MESA approved the "double compartment slope."

8. The petitioner also argues that § 820(a), as interpreted by the Board, creates an "irrebuta-

ble presumption" of the validity of withdrawal orders. Again, this argument misses the point. The validity of a withdrawal order is not "presumed" in miners' applications for compensation under § 820(a); on the contrary, Congress has determined that in 820(a), clause [1], applications, the validity of the underlying withdrawal order shall not be an issue at all.