DISTRICT 6, UNITED MINE WORKERS OF AMERICA et al., Petitioners,

v.

UNITED STATES DEPARTMENT OF the INTERIOR BOARD OF MINE OPERATIONS APPEALS, Respondent.

No. 75–1704.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 24, 1976.

Decided Aug. 9, 1977.

Rehearing Denied Sept. 7, 1977. As Amended Oct. 14, 1977.

Michael Kimmel, Atty., Dept. of Justice, Washington, D. C., for respondent. Rex E. Lee, Asst. Atty. Gen., Robert E. Kopp and Karen K. Siegel, Attys., Dept. of Justice, Washington, D. C., were on the brief for respondent.

William A. Gershuny, Washington, D. C., with whom Guy Farmer, Washington, D. C., was on the brief for intervenor.

Charles E. DeBord, II, for petitioners. John W. Cooper and Steven B. Jacobson, Washington, D. C., were on the brief for petitioners.

Before LEVENTHAL, MacKINNON and ROBB, Circuit Judges.

Opinion for the court filed by Circuit Judge MacKINNON.

Concurring opinion filed by LEVENTHAL, Circuit Judge.

MacKINNON, Circuit Judge:

On July 19, 1974, the roof fell in on a portion of the Meigs No. 2 Mine of the Southern Ohio Coal Company, near Athens, Ohio. A miner was killed. A federal coal mine inspector at once ordered all miners to evacuate that portion of the mine because of "imminent danger." The next day, upon finding an inadequately supported roof, he extended his closure order to the entire mine. The inspector also found a great many other violations of the Mandatory Safety Standards promulgated by the Bureau of Mines; and the mine stayed closed until July 27, 1974.

The evacuation was ordered for "imminent danger" pursuant to 30 U.S.C. § 814(a) (1970),[1] the Federal Coal Mine Health and Safety Act of 1969.[2] An "imminent danger" is a term of art defined by that Act as "the existence of any condition or practice in a coal mine which could reasonably be expected to cause death or serious physical harm before such condition or practice can be abated."[3] Closure of a mine, or the dangerous area of the mine, is mandatory upon finding an imminent danger.

The Petitioners here are 126 miners at Meigs No. 2 who were without work from July 19, 1974, to July 27, 1974. Their claim is for compensation from the mine operators for a week's wages. Under 30 U.S.C. § 820,[4] coal miners idled by a closure order are entitled to pay for the rest of the shift

1. (a) If, upon any inspection of a coal mine, an authorized representative of the Secretary finds that an *imminent* danger exists, such representative shall determine the area throughout which such danger exists, and thereupon shall issue forthwith an order requiring the operator of the mine or his agent to cause immediately all persons, except those referred to in subsection (d) of this section, to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such imminent danger no longer exists.

30 U.S.C. § 814(a) (1970). (Emphasis added).

2. Pub.L.No. 91–173, 83 Stat. 742.

3. 30 U.S.C. § 802(j) (1970).

4. (a) If a coal mine or area of a coal mine is closed by an order issued under section 814 of this title, all miners working during the shift when such order was issued who are idled by such order shall be entitled to full compensation by the operator at their regular rates of pay for the period they are idled, but for not more than the balance of such shift. If such order is not terminated prior to the next working shift, all miners on that shift who are idled by such order shall be entitled to full compensation by the operator, at their regular rates of pay for the period they are idled, but for not more than four hours of such shift. If a coal mine or area of a coal mine is closed by an order issued under section 814 of this title for an *unwarrantable failure* of the operator to comply with any health or safety standard, all miners who are idled due to such order shall be fully compensated, after all interested parties are given an opportunity for a public hearing on such

compensation and after such order is final, by the operator for lost time at their regular rates of pay for such time as the miners are idled by such closing, or for one week, whichever is the lesser. Whenever an operator violates or fails or refuses to comply with any order issued under section 814 of this title, all miners employed at the affected mine who would be withdrawn from, or prevented from entering, such mine or area thereof as a result of such order shall be entitled to full compensation by the operator at their regular rates of pay, in addition to pay received for work performed after such order was issued, for the period beginning when such order was issued and ending when such order is complied with, vacated, or terminated.

(b)(1) No person shall discharge or in any other way discriminate against or cause to be discharged or discriminated against any miner or any authorized representative of miners by reason of the fact that such miner or representative (A) has notified the Secretary or his authorized representative of any alleged violation or danger, (B) has filed, instituted, or caused to be filed or instituted any proceeding under this chapter, or (C) has testified or is about to testify in any proceeding resulting from the administration or enforcement of the provisions of this chapter.

(2) Any miner or a representative of miners who believes that he has been discharged or otherwise discriminated against by any person in violation of paragraph (1) of this subsection may, within thirty days after such violation occurs, apply to the Secretary for a review of such alleged discharge or discrimination. A copy of the application shall be

and up to four hours of the next shift,[5] and they may also receive up to a week's pay, "[i]f a coal mine or area of a coal mine is closed by an order issued under section 814 of this title for an *unwarrantable failure* of the operator to comply with any health or safety standard." (Emphasis added). A separate provision of the statute permits a federal coal mine inspector to close a mine, even though there is no imminent danger, if there is "an unwarrantable failure of [an] . . . operator to comply with such mandatory health or safety standards" with respect to two or more violations.[6]

Here, the closure order was issued because of "imminent danger"—the collapsing roof, not by an "order issued . . . for an unwarrantable failure of the operator to comply with any health or safety standard." Further inspection of the closure order disclosed other, unrelated violations of mandatory safety standards. Petitioners offer to prove in support of their compensation claim that the violation directly leading to the imminent danger closure, and several of the other violations as well, constituted "unwarrantable" failures to abide by mandatory safety regulations. There has developed a body of coal-mine administrative law giving a definite meaning to the term "unwarrantable failure"; it approximates that conduct which in the law of torts is generally described as gross negligence.[7] For pur-

---

5. Petitioners also sought, at least, rest-of-shift and four-hours pay. That claim has now been paid and does not constitute any part of this appeal.

6. (c)(1) If, upon any inspection of a coal mine, an authorized representative of the Secretary finds that there has been a violation of any mandatory health or safety standard, and if he also finds that, while the conditions created by such violation do not cause imminent danger, such violation is of such nature as could significantly and substantially contribute to the cause and effect of a mine safety or health hazard, and if he finds such violation to be caused by an unwarrantable failure of such operator to comply with such mandatory health or safety standards, he shall include such finding in any notice given to the operator under this chapter, If, during the same inspection of any subsequent inspection of such mine within ninety days after the issuance of such notice, an authorized representative of the Secretary finds another violation of any mandatory health or safety standard and finds such violation to be also caused by an unwarrantable failure of such operator to so comply, he shall forthwith issue an order requiring the operator to cause all persons in the area affected by such violation, except those persons referred to in subsection (d) of this section, to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such violation has been abated.

30 U.S.C. § 814(c)(1) (1970).

7. *See, e. g., Eastern Associated Coal Corp.,* 81 Interior Dec. 567 (Bd.Mine Op.App.1974). *International Union, United Mine Workers of America v. Kleppe,* 174 U.S.App.D.C. 328, 532

sent to such person who shall be the respondent. Upon receipt of such application, the Secretary shall cause such investigation to be made as he deems appropriate. Such investigation, shall provide an opportunity for a public hearing at the request of any party to enable the parties to present information relating to such violation. The parties shall be given written notice of the time and place of the hearing at least five days prior to the hearing. Any such hearing shall be of record and shall be subject to section 554 of Title 5. Upon receiving the report of such investigation, the Secretary shall make findings of fact. If he finds that such violation did occur, he shall issue a decision, incorporating an order therein, requiring the person committing such violation to take such affirmative action to abate the violation as the Secretary deems appropriate, including, but not limited to, the rehiring or reinstatement of the miner or representative of miners to his former position with back pay. If he finds that there was no such violation, he shall issue an order denying the application. Such order shall incorporate the Secretary's findings therein. Any order issued by the Secretary under this paragraph shall be subject to judicial review in accordance with section 816 of this title. Violations by any person of paragraph (1) of this subsection shall be subject to the provisions of sections 818 and 819(a) of this title.

(3) Whenever an order is issued under this subsection, at the request of the applicant, a sum equal to the aggregate amount of all costs and expenses (including the attorney's fees) as determined by the Secretary to have been reasonably incurred by the applicant for, or in connection with the institution and prosecution of such proceedings, shall be assessed against the person committing such violation.

30 U.S.C. § 820 (1970). (Emphasis added).

poses of this appeal, we must assume petitioners can prove that the circumstances at the Meigs No. 2 mine which led to the closing for imminent danger involved this kind of negligent behavior.

The issue before this court is thus quite clearly stated. Is the week's lost pay provision of 30 U.S.C. § 820(a) limited to closures actually ordered because of two or more unwarrantable failures, or can it extend to closures ordered because of an imminent danger when later investigation demonstrates the existence of two or more unwarrantable failures, perhaps even unwarrantable failures that caused the imminent dangers?

## I. ADMINISTRATIVE HISTORY OF THE CASE.

On September 3, 1974, petitioners filed, in the Office of Hearings and Appeals of the Department of the Interior, an application for compensation based on the theory above outlined. That application was dismissed on December 11, 1974, by the Administrative Law Judge, and his opinion was, in so far as here relevant, affirmed by the Interior Board of Mine Operations Appeals on June 25, 1975.[8]

Petitioners' application alleged that they "were idled because of numerous violations of the Federal Coal Mine Health and Safety Acts of 1969 . . . [which] were caused by unwarrantable failures of the respondent to comply with mandatory health or safety standards . . . ." (J.A. 12).

The petition thus sought to review certain aspects of the closure order itself (namely, that it was actually due to unwarrantable failures) rather than to challenge aspects of the compensation paid pursuant to the closure order as issued. In so challenging the closure order, the petition relied upon the wrong statutory section. Section 820 of Title 30, U.S.C., provides for the Board to rule on a compensation claim "after all interested parties are given an opportunity for a public hearing on such compensation." Section 815 of Title 30, U.S.C. permits "any representative of miners in any mine affected by such order . . . [to] apply to the Secretary for review of the order . . . ." There are important procedural differences between the two statutory review provisions. The most notable difference is that section 815 requires adherence to the Administrative Procedure Act whereas section 820 does not.[9] The Interior Board of Mine Operations Appeals in *Clinchfield, infra,* has already stated that section 820 hearings "are those relating to compensation due the claimants under the order *as issued.*"[10] There is no great hardship in seeking section 815 review; indeed, it provides for a more complete hearing than does section 820.

Hence, petitioners have not followed the proper procedure in bringing their claim. They should have first sought to reform the closure order under section 815 to reflect the unwarrantable failures;[11] and, if successful, sought section 820 review only if the mine operator refused to pay the

---

F.2d 1403 (1976) held that the gravity criteria set forth in the first sentence of section 814(c)(l) were not required to be met before a section 814(c)(l) withdrawal order may properly issue in accordance with the second sentence of said section. It left open the definition of "unwarrantable failure."

**8.** *Hatfield v. Southern Ohio Coal Co.,* 82 Interior Dec. 289 (Bd.Mine Op.App.1975).

**9.** Section 815 provides:
The operator and the representative of the miners shall be given written notice of the time and place of the hearing at least five days prior to the hearing. Any such hearing shall be of record and shall be subject to section 554 of Title 5.
30 U.S.C. § 815(a)(2) (1970).

**10.** *District No. 31, UMW (Clinchfield),* 78 Interior Dec. 153, 160 (Bd.Mine Op.App.1971).

**11.** This would *not* be an attempt to prove that the closure order should have been issued as an unwarrantable-failure order under 30 U.S.C. § 814(c)(1). It would only be an evidentiary hearing to demonstrate that unwarrantable failures did exist. Indeed, it would be futile to argue that the closure should have been for unwarrantable failures since 30 U.S.C. § 814(c)(1) explicitly includes as a precondition to such a closure that "the conditions created by such violation do *not* cause imminent danger." (Emphasis added).

week's compensation. The imminent danger closure was ordered on July 19, and all of the inspector's findings were completed as of July 28 (J.A. 31), yet the petition was not filed until September 3, 1974 (J.A. 51). Petitions for review under section 815 must be filed within thirty days of the closure order at issue.[12] Hence, petitioners were also fifteen days late in their filing.

However, it would be harsh to bar petitioner's claim because of untimeliness, since the claim was timely filed as a section 820 complaint (albeit on the last day, and giving credit for the withdrawal order's amendment on July 20).[13] Further, the same Board opinion that explained the limited scope of a section 820 proceeding went on to say "we cannot interpret section [814(c)] to imply that the basis for a finding of unwarrantable failure can be established retrospectively for the purpose of determining compensation under section [820(a)]."[14] Petitioners knew, therefore, that the Board would not recognize their claim no matter how it was brought. Their only purpose in seeking to review the closure order to prove unwarrantable failures was to establish a compensation claim, so they filed for compensation. The regulation allowed forty-five days for such a claim and they were within the limit. Hence it would be unfair to refuse consideration of the merits of their appeal because they chose the wrong statutory subsection under which to proceed. Particularly is this so in light of the Board's *Clinchfield* opinion,[15] indicating

that, even if proper procedure had been followed and a full section 815 proceeding had taken place, the result would be precisely the same as the Board did reach.[16]

## II. THE LEGISLATIVE HISTORY OF THE CLOSURE COMPENSATION PROVISIONS.

Petitioners contend that the statutory language on its face is not entirely free of ambiguity.

> If a coal mine or area of a coal mine is closed by an order issued under section 814 of this title for an unwarrantable failure . . .

30 U.S.C. § 820(a). If the normal interpretative rule of the Last Antecedent is applied,[17] the phrase "for an unwarrantable failure . . ." would be interpreted to refer directly to the phrase that proceeds it, *i. e.:* "an order issued under section 814 of this title" so that only unwarrantable failure *orders* would evoke the larger compensation. Alternatively, it is contended that the phrase could modify the main clause, "If a coal mine . . . is closed," so that any closure traceable to an unwarrantable failure would be entitled to the larger compensation. The first reading is to be preferred as the more normal and less strained, especially considering that there is a separate type of closure order for unwarrantable failures. The second reading is not completely outside the language of the statute because it relies on the reference to

---

**12.** 30 U.S.C. § 815(a)(1).

**13.** An application for compensation shall be filed within 45 days after the date of issuance of the withdrawal order which gives rise to the claim.

43 C.F.R. § 4.561 (1976).

**14.** *District No. 31, UMW (Clinchfield), supra* note 10, at 160.

**15.** *District No. 31, UMW (Clinchfield), supra* note 10.

**16.** Necessarily, we therefore hold that, at least in the context of this case, the defect is not jurisdictional. Rather, it is of a type that might have been available as a discretionary reason for not deciding the substantive question presented had that question, for example, been one of constitutional, not merely statutory, in-

terpretation. *See Rescue Army v. Municipal Court of Los Angeles,* 331 U.S. 549, 568, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947).

**17.** *FTC v. Mandel Brothers,* 359 U.S. 385, 389–390, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959); *United States v. Pritchett,* 152 U.S.App.D.C. 307, 311 & n. 9, 470 F.2d 455, 459 & n. 9 (1972) (collecting cases). 2A Sands, Sutherland Statutory Construction states:

> § 47.33. Referential and qualifying words. Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent, which consists of "the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence."

"*Section 814*" and is not limited to any subsection thereof. The second reading also, would not be inconsistent with some of the general objectives of the Act. It can be argued that where two equivalent mining operations are both run with unwarrantable failures to observe mandatory safety requirements in each, it would be anomalous to impose a lesser monetary burden of compensation on the one whose failures were so severe as to cause imminent danger.

Such argument presents the question as to what extent the general objective of the Act should be construed to override its specific provisions. We thus consider the legislative history to determine which interpretation Congress intended.

Congress included a declaration of purpose in the Federal Coal Mine Health and Safety Act of 1969, and codified it at 30 U.S.C. § 801. The very first sentence of that declaration states a theme that is repeated time and again throughout the hearings, committee reports, and debate on the floor, one theme that is preeminent over all others in the legislative history: "Congress declares that—(a) the first priority and concern of all in the coal mining industry must be the health and safety of its most precious resource—the miner . . . ." Should a conflict develop between a statutory interpretation that would promote safety and an interpretation that would serve another purpose at a possible compromise to safety, the first should be preferred.

We now turn to the legislative history of the precise sections involved in this appeal. Lost-time compensation provisions were present in the original bills in both the House and the Senate. The Senate version contained a list of premises for a closure order, one of which was essentially 30 U.S.C. § 814(c)(1)—concerned with the finding of two or more unwarrantable failures to abide by mandatory safety standards. The compensation section read:

Should a mine or portion of a mine be closed by an order issued by the Secretary or his authorized representative for repeated failures of the operator to comply with any health or safety standard established by, or promulgated pursuant to, titles I or II of this Act, the Secretary shall, after all interested parties have been given an opportunity for a hearing, order that all miners who are idled due to the order shall be fully compensated by the operator for lost time, as determined by the Secretary, at their regular rates of pay for such time as the miners are idled by such closing, or for one week, whichever is the lesser.

115 Cong.Rec. 28,254 (Oct. 2, 1969).

The reference to "repeated failures" encompasses the "unwarrantable failures" section just mentioned, and also the circumstance where a mine-operator failed to correct a violation after having been warned to do so. Under the Senate bill, however, no situation other than "repeated failures" would qualify for the payment of any compensation whatsoever (even for the rest of the idled shift). The reason is stated in the Senate Committee Report:

In respect to wage payments for time lost due to closure under a withdrawal order, the committee consensus was that it would not be proper to require the operator to make such payments unless the withdrawal order was based on "repeated failures" to comply with any health or safety standard. The bill accordingly makes payment provisions operative only where there have occurred at least two failures to comply with a health or safety standard. The failures do not have to relate to the same or a similar health or safety standard.

S.Rep.No. 411, 91st Cong., 1st Sess. 37 (1969). The discussion of payments as being "proper" connotes a concern with fairness. The closing of a mine means lost profits for the operator and lost wages for the miners. In most cases, those losses would remain where they fell. Fines would be imposed upon mine operators who violated mandatory safety standards,[18] so the further punishment of shifting the burden of lost pay would not be proper, except for unregenerate operators.

18. 30 U.S.C. § 819.

The House bill, on the other hand, was content to leave all punishment to the fine provisions.[19] However, it would shift the lost pay burden onto the employer for the rest of the shift and up to four hours of the next shift as a cost of doing business.[20] This was irrespective of what precipitated the closure order.

When the two bills were hammered out in the conference committee, the House version was adopted, "except that where the mine is closed by an order issued on account of an unwarrantable failure of the operator to comply with a health or safety standard, the miners who are idled will obtain the benefits described in the Senate bill." S.Rep.No. 761, 91st Cong., 1st Sess. (1969), *reprinted in* 2 [1969] U.S. Code Cong. & Ad.News, pp. 2578, 2588. While the statute reads "by an order issued under section 814 of this title *for* an unwarrantable failure," the conference report uses the phrase "by an order issued *on account of* an unwarrantable failure." (Emphasis added). Also, while the Senate compensation provision applied to any "repeated failure," the eventual law which emerged from the conference committee bill specified (by virtue of the reliance of section 820(a) or subsection

(c)(1) of section 814) that compensation was payable only where the closure was ordered for more than one "unwarrantable failure." In terms of culpability, a mine operator who did not correct a failure to meet a mandatory standard when warned to do so would be no less guilty than one whose mining operations displayed at least two different unwarrantable failures to comply with mandatory health or safety standards but who had not previously been ordered to correct them. Yet the conference committee singled out the latter for special compensation and let pass the former (which would have been covered by the original Senate bill).[21] The conference committee's interpretation of the word "for" to mean "on account of" and its deliberate selection of one particular closing order over others of equal culpability compel a reading of 30 U.S.C. § 820(a) in its literal sense: Extra compensation is afforded only when the mine is closed by an order issued under 30 U.S.C. § 814(c)(1) for multiple unwarranted failures.[22]

If it has been established that Congress intended to provide exactly what 30 U.S.C. § 820(a) says, it might still be argued that it was unreasonable for Congress to do so.

**19.** Failure to evacuate a mine when ordered to do so carried an additional penalty, but this was in the nature of a fine as it was unrelated to the actual hours of compensation lost. *See* H.Rep.No. 563, 91st Cong., 1st Sess. (1969), *reprinted in* 2 [1969] U.S. Code & Ad.News 2503, 2514; 30 U.S.C. § 820(a)(last sentence).

**20.** In *Rushton Mining Co. v. Morton,* 520 F.2d 716 (3d Cir. 1975), the court held that the rest-of-shift and four-hours compensation was owing under 30 U.S.C. § 820 after a closure order issued under 30 U.S.C. § 814(b), even where subsequent investigation vacated the § 814(b) closure order.

**21.** This interpretation results from the fact that subsection (b) of § 814 directs that such closures are for violation of the inspector's order and not for "unwarrantable failure," *i. e.:*

(b) Except as provided in subsection (i) of this section, if, upon any inspection of a coal mine, an authorized representative of the Secretary finds that there has been a violation of any mandatory health or safety standard but the violation has not created an imminent danger, he shall issue a notice to the operator or his agent fixing a reasonable time for the abatement of the violation. If,

upon the expiration of the period of time as originally fixed or subsequently extended, an authorized representative of the Secretary finds that the violation has not been totally abated, and if he also finds that the period of time should not be further extended, he shall find the extent of the area affected by the violation and shall promptly issue an order requiring the operator of such mine or his agent to cause immediately all persons, except those referred to in subsection (d) of this section, to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that the violation has been abated.

30 U.S.C. § 814(b). The result is a repeated failure which under the act is not designated as an unwarrantable failure.

**22.** The syntax of 30 U.S.C. § 820, when read in conjunction with 30 U.S.C. § 814, also supports this simpler interpretation. Section 820 has three clauses; they refer, sequentially, to section 814(a) or (b), to section 814(c), and to section 814 generally. *See Rushton Mining, supra* note 20, 520 F.2d at 719–720.

There is no further guidance available to this Court, after a thorough reading of the legislative history, to explain why Congress made the choices it did. Fines would serve the desired deterrent purpose against any negligent behavior, but it was not irrational for Congress to single out one particular dangerous circumstance for special additional deterrence. The reasonableness of Congress' choice is not at issue here except as a possible guide to its intent. The legislative scheme here involved, however, is not so unreasonable as to compel a rejection of what the action of the two houses indicated was the intent of Congress.

■ Even if a higher standard of review, requiring more justification, were appropriate, there is a very good reason not to allow the re-opening of an "imminent danger" closure order for the sake of imposing more liability on the employer. The safety of the miner is the single most crucial motivation behind the Federal Coal Mine Health and Safety Act of 1969. That is borne out in the congressional hearings,[23] in the first section of the actual statute,[24] and in judicial review.[25] All of these sources support the clear intent of Congress that coal mines, or areas of coal mines, in which imminent danger was found to exist must be evacuated *at once,* with the benefit of any doubt cut in favor of withdrawal. Section 104 of the Act permits closure orders essentially of two types: for imminent danger (30 U.S.C. § 814(a)) or for behavior by a mine operator indicating a disregard for the Bureau of Mines' Safety Standards and orders (30 U.S.C. § 814(b), (c)(1) & (2)). Imminent danger could exist even without any failing by the mine operator,[26] for example, as a result of natural causes; whereas the other closures all involve some negligence by the operator. In the words of the Senate Report:

The concept of an imminent danger as it has evolved in this industry is that the situation is so serious that the miners must be removed from the danger *forthwith* when the danger is discovered without waiting for any formal proceedings or notice. The seriousness of the situation demands such immediate action. The first concern is the danger to the miner. *Delays, even of a few minutes, may be critical or disastrous.*

S.Rep.No. 761, *supra* p. 8, at 90 (emphasis added).

Interpreting section 820 to permit the awarding of lost work compensation for up to a full week after an imminent danger closure order would have the necessary effect of making federal mine inspectors more hesitant to issue such orders. Perhaps the additional hesitancy would be very small; perhaps it would be further attenuated by the interposition of a section 820 hearing before the heavy monetary obligation was levied. But neither of those arguments can negate the fact that a mine inspector will think longer before taking an action that will cost the operating company a more serious monetary obligation. Since the obligation is directly proportional to the extent of operations shut down, this hesitancy might take the form of a narrower area defined in the closure order. However it is manifested, it would be intolerable.

The Committee hearings demonstrate that the Senate was very concerned by the possibility of any deterrent effect upon federal coal mine inspectors. In setting the size of a fine for violation of a mandatory health and safety standard, the Senate bill had originally proposed a $500 minimum. Mr. John O'Leary, Director of the Bureau

**23.** *See, e.g.,* testimony of Secretary Hickel, *Bills to Improve the Health and Safety Conditions of Persons Working in the Coal Mining Industry of the United States: Hearings on S.355 et al. Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare,* 91st Cong., 1st Sess. 518, 520 (1969).

**24.** *See* —— of 183 U.S.App.D.C., p. 1262 of 562 F.2d 6, *supra.*

**25.** *See, e. g., Rushton Mining, supra* note 20, 520 F.2d at 720; *IBMOA,* 504 F.2d 741, 744 (7th Cir. 1974).

**26.** This was recognized in the Senate Report, S.Rep.No. 761, *supra* p. 8, at 90.

of Mines, testified that the administration bill had no such minimum, and the reason was precisely to avoid inducing the slightest reluctance on the part of a mine inspector to issue a citation for a violation.[27] The bill that was eventually adopted included no minimum level on fines.[28] The fear of making mine inspectors more hesitant was felt to be serious enough to warrant a change in the proposed bill, even though (1) a full hearing would be available for a mine operator to challenge any fine levied; (2) a closure order did not automatically follow a citation (as it would for imminent dangers); and (3) the monetary obligation inducing this reluctance was only $500 (whereas the loss in pay for a week would total many thousands of dollars more than rest-of-shift-plus-four-hours compensation).

The dominant purpose of the Federal Coal Mine Health and Safety Act of 1969 would thus be furthered by avoiding the slightest impediment to the issuance of an "imminent danger" closure order. The true interest of the miner is vindicated far more faithfully by paying attention to this concern than by focusing on money compensation. The interpretation we give to the statute also comports with the reading given by the agency most directly concerned with its enforcement,[29] and with the clear literal sense of the language. Accordingly, the order of the Interior Board of Opera-

tions Appeals denying this petition is affirmed.

*So ordered.*

LEVENTHAL, Circuit Judge, concurring:

I join in the result on the ground that the order issued by the mine inspector was based solely on imminent danger, and was not based on unwarrantable failure to maintain safety standards.

Judge MacKinnon's opinion lends lucidity to statutory provisions that on their own are murky, and a legislative history that is confusing. However, it is my view that the statute does not require an absolute and clear dichotomy—that the closing order must be either for imminent danger, or for unwarrantable failure to maintain safety standards, but not for both reasons. Questions of legislative intent require the courts, in the last analysis, to reconstruct how the legislature would have decided the specific issue if it had been specifically addressed by the legislature.* I find it hard to suppose that Congress would have said—We want the operator to be responsible for compensation in an ordinary case of unwarrantable failure, but not in a case that is so extreme that his unwarrantable failure has led to an "imminent danger" of explosion.

The kind of blunt consideration Congress was giving to the problem, as outlined in

---

**27.** Senator RANDOLPH. Now we come to the matter of civil penalties. In S. 335, there are spelled out some dollar figures, $500 minimum. You have no minimum. I wish you would speak to that point.

Mr. O'LEARY. We thought it was unduly binding on the Secretary, Senator Randolph, to have a minimum. There might be an unintentional and inadvertent violation of a relatively minor standard. It seems to me that we have to leave with the Secretary discretion to set fines that are in accordance with the violation. I think that that discretion was not in the previous measure.

Senator RANDOLPH. That is right. You believe, then, that an exact figure could be a straitjacketed mandate which might not be feasible in all cases?

Mr. O'LEARY. *I think, going further, that if an inspector realized that a relatively minor violation,* for example, a danger sign being down, *would result in a $500 fine to the*

*management, he might not report the violation at all.*
*Bills to Improve the Health and Safety, supra* note 20, at 530 (emphasis added).

**28.** *See* 30 U.S.C. § 819.

**29.** *See District No. 31, UMW, supra* note 10.

* *Montana Power Co. v. Federal Power Commission,* 144 U.S.App.D.C. 263, 270, 445 F.2d 739, 746 (en banc), *cert. denied,* 400 U.S. 1013, 91 S.Ct. 566, 27 L.Ed.2d 627 (1970); *City of Chicago v. Federal Power Commission,* 128 U.S.App. D.C. 107, 113, 385 F.2d 629 (1967), *quoting* Learned Hand, J., in *United States v. Klinger,* 199 F.2d 645, 648 (2d Cir. 1952):

Flinch as we may, what we do, and must do, is to project ourselves, as best we can, into the position of those who uttered the words, and to impute to them how they would have dealt with the concrete occasion.

the legislative history reviewed by Judge MacKinnon, is more congruent with its taking the view that compensation orders were appropriate, when the operator was guilty of unwarrantable failures, as an allocation of burden related to guilt, and that this imposition of burden is equally appropriate, and if anything even more appropriate, when the operator's derelictions ("unwarrantable" failures) had the consequence of presenting an imminent danger.

The only possible indicator to the contrary rests on administrative considerations. Certainly the department may reasonably conclude that imminent closure orders could be subject to problems of delay if the inspector were simultaneously *required* to consider the issue of unwarrantable failure. But it would seem to me open to the department, under this statute, to provide by regulation for a procedure whereby an imminent closure danger *could* be accompanied by an unwarrantable failure finding— either in the same order, or a contemporaneous order issued the same day. For example, I have in mind this could be projected when the inspector could make the "unwarrantable failure" determination readily, from observations in hand before the "imminent danger" became apparent. This is a matter that would lie within administrative discretion, in my view. It is not before us in the present case, for I would certainly agree with Judge MacKinnon that the statute may reasonably be interpreted by the administrative agency, in the interest of safety, as permitting the inspector to focus on immediate closure, in the case of imminent danger, without being obligated in a particular case to make the effort and take the time that may be necessary to make a determination, one way or the other, on the issue of unwarrantable failure. Here the closing order made no reference to the unwarrantable failure standard. Accordingly, I concur in the mandate of affirmance.

---

* The court has retained the style of the complaint as filed in the District Court, without substitution of officials, because the nature of the action, as one for damages in tort, apparently contemplates a judgment against the defendant(s) as individuals, even though the complaint does not expressly state that the action is brought against the defendants in both their individual and official capacities.