Howard MULLINS and United Mine Workers of America, Petitioners,

v.

Cecil D. ANDRUS, Secretary of the Interior, Respondent,

Consolidation Coal Co., Intervenor.

No. 77–1086.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 21, 1979.

Decided Dec. 31, 1980.

Steven B. Jacobson, Washington, D. C., with whom Charles Griffin Cale, Washington, D. C., was on the brief, for petitioners. Harrison Combs, Washington, D. C., also entered an appearance for petitioner United Mine Workers.

Michael Kimmel, Atty., Dept. of Justice, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen., at the time the brief was filed, Washington, D. C., Leonard Schaitman and William Kanter, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondent.

Timothy M. Biddle and John I. Stewart, Jr., Washington, D. C., were on the brief for intervenor.

Before ROBINSON and ROBB, Circuit Judges, and DAVIS,* Judge, United States Court of Claims.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

Concurring Opinion filed by Circuit Judge ROBB.

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1976).

1. Pub.L.No. 91–173, 83 Stat. 742, 30 U.S.C. §§ 801 *et seq.* (1976). After administrative proceedings in the instant case had been completed, this legislation was substantially amended and reenacted as the Federal Mine Safety and Health Act of 1977, Pub.L.No. 95–164, 91 Stat. 1290 (1977). The 1969 provisions pivotal to our substantive decision today—§ 203(b)(2)–(3), 30 U.S.C. § 843(b)(2)–(3) (1976)—were left unchanged, and the 1977 supersession of the only 1969 procedural provisions of real importance here—§§ 105(a)–(c), 30 U.S.C. §§ 815(a)–(c) (1976)—does not affect cases theretofore resolved administratively. *UMW v. Andrus (Carbon Fuel Co.),* 189 U.S. App.D.C. 110, 111 n.3, 581 F.2d 888, 889 n.3, *cert. denied,* 439 U.S. 928, 99 S.Ct. 313, 58 L.Ed.2d 321 (1978). Consequently, the 1977 revisions do not affect our review, though occasionally we utilize them for informational purposes.

2. Black lung disease, the scourge of the coal mining industry, is caused by inhalation of coal dust. See S.Rep.No. 411, 91st Cong., 1st Sess. 7–8 (1969); *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 6–8, 96 S.Ct. 2882, 2888–2889, 49 L.Ed.2d 752, 761–763 (1976); *Higgins v. Marshall,* 190 U.S.App.D.C. 54, 58–59, 584 F.2d 1035, 1039–1040 (1978) (dissenting opinion),

---

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

The Federal Coal Mine Health and Safety Act of 1969[1] conferred upon every miner contracting pneumoconiosis—black lung disease[2]—the right to transfer from his existing position to another in a less dusty area of the mine for as long as necessary to arrest development of the disease.[3] To encourage afflicted miners to do so, the Act featured a pay-maintenance provision entitling a transferring miner to "receive compensation for [his post-transfer] work at not less than the regular rate of pay received by him immediately prior to his transfer."[4] The problem centrally posed in this case is the meaning to be ascribed to "regular rate of pay" in the instance of a miner who was recompensed at different rates for different types of work done during varying periods before transfer.

The Interior Board of Mine Operations Appeals held that the statutory phrase refers to the miner's classification rate—the rate due the miner by reason of his job

---

*cert. denied,* 441 U.S. 931, 99 S.Ct. 2051, 60 L.Ed.2d 659 (1979).

3. Federal Coal Mine Health and Safety Act of 1969, § 203(b)(2), 30 U.S.C. § 843(b)(2) (1976), providing that

[e]ffective three years after [December 30, 1969], any miner who, in the judgment of the Secretary of Health, Education, and Welfare . . . shows evidence of development of pneumoconiosis shall be afforded the option of transferring from his position to another position in any area of the mine, for such period or periods as may be necessary to prevent further development of such disease, where the concentration of respirable dust in the mine atmosphere is not more than 1.0 milligrams [*sic*] of dust per cubic meter of air, or if such level is not attainable in such mine, to a position in such mine where the concentration of respirable dust is the lowest attainable below 2.0 milligrams [/*sic*] per cubic meter of air.

The Federal Mine Safety and Health Act Amendments of 1977, § 202(a), amended subsection (e), 30 U.S.C. § 842(e) (Supp. II 1978), to elucidate the references to concentrations of respirable dust.

4. Federal Coal Mine Health and Safety Act of 1969, § 203(b)(3), 30 U.S.C. § 843(b)(3) (1976).

classification under the current wage agreement—notwithstanding frequent temporary assignments in a higher-paying position, when the miner did not endeavor to secure that position on a permanent basis.[5] We conclude that "the regular rate of pay" is the dollar rate—the rate at which the miner was actually remunerated for the work he did—irrespective of his job classification.[6] Accordingly, we reverse the order under review and remand the case for appropriate disposition.

## I

The salient facts were stipulated by the parties.[7] On January 25, 1971, petitioner Mullins was hired by Pocahontas Fuel Company for work as a miner in its Kepler Mine in Horsepen, Virginia.[8] Three years later, Pocahontas closed the Kepler Mine but offered its complement of miners employment in other company mines with job openings.[9] Mullins availed himself of this opportunity at the company's Maitland Mine in McDowell County, West Virginia.[10]

At the time of the Kepler Mine closure, Mullins was classified as a roof bolter under the collective bargaining agreement in effect.[11] When Mullins arrived at the Maitland Mine, however, he was informed that all roof-bolter positions were filled.[12] Mullins then signed on at less pay as a "general inside laborer"[13] and began work on January 9, 1974.[14]

Mullins retained his job classification as a general inside laborer throughout the events leading to this litigation,[15] but the company often gave him temporary assignments as a roof bolter. Between January 9 and June 17, 1974—the date that was to assume considerable importance—Mullins worked 496 hours as a roof bolter and 208 hours as a general inside laborer.[16] Though categorized continually as a general inside laborer, Mullins was compensated at the higher wage-rate of a roof bolter whenever he worked as such.[17]

On May 10, 1974, the company was formally notified that Mullins, by then a victim of pneumoconiosis, had decided to exercise his statutory right to transfer from his post at the face of the mine to another in a location more conducive to his health.[18] On June 17, the move was effected,[19] and shortly afterwards the present controversy arose. Although Mullins had worked and been paid as a roof bolter during more than seventy percent of the five months preceding his transfer,[20] he was relegated to the reduced wage-rate of a general inside laborer after

5. *Pocahontas Fuel Co.*, 83 Interior Dec. 690, 692 (1976), aff'g *Pocahontas Fuel Co. v. Mining Enforcement & Safety Admin.*, Doc.No. HOPE 75–680 (Mar. 3, 1975) (administrative law judge's decision), Joint Appendix (J.App.) 27–33.

6. Part III *infra*.

7. J.App. 14–23.

8. J.App. 16.

9. J.App. 16.

10. J.App. 16.

11. J.App. 16.

12. J.App. 16.

13. J.App. 17. Roof bolters were paid $47.25, and general inside laborers $42.75, per shift. J.App. 17, 28.

14. J.App. 17.

15. J.App. 17.

16. J.App. 17–19.

17. J.App. 17.

18. J.App. 19.

19. J.App. 19.

20. Mullins commenced work at the Maitland Mine on January 9, 1974. J.App. 17. On May 10, 1974, the company was notified of his election to transfer to another position in the mine because of his pneumoconiosis. J.App. 19. That transfer was effected on June 17, 1974. J.App. 19. Between January 9 and May 12 Mullins worked 352 hours as a roof bolter and 168 hours as a general inside laborer. J.App. 17–18. Between May 12 and June 15 he worked 144 hours as a roof bolter and 40 hours as a general inside laborer. J.App. 19. So, of the total of 704 hours worked between January 9 and June 17, 496—70.45%—were as a roof bolter.

the transfer.[21] Both Mullins and his union felt that he was entitled to more, and a federal mine inspector agreed. Deeming the Act's pay-maintenance provision a mandatory health standard, the inspector gave the company notice of a statutory violation.[22]

Before expiration of the time for abatement of the violation and before issuance of an order withdrawing miners,[23] the company applied for administrative review of the violation notice. An administrative law judge considered the notice on the merits and vacated it on the ground that Mullins could legally claim only the pay rate of a general inside laborer.[24] The Interior Board of Mine Operations appeals affirmed,[25] and this petition for review followed.[26]

Mullins asserts that the mine inspector's notice of violation was not then reviewable because miners had not been ordered to withdraw from the mine. Alternatively, Mullins argues that the Board erred in its holding on the rate of pay to which he was entitled after his transfer. Since the first contention was identical to one already before us in *UMW v. Andrus (Carbon Fuel Co.)*,[27] we held the instant case in abeyance pending our decision therein. We concluded in *Carbon Fuel* that a notice of violation of a mandatory health standard not posing imminent danger was not reviewable on its merits prior to issuance of an order withdrawing miners from the affected area.[28] Shortly thereafter, another panel of the court decided *Higgins v. Marshall*,[29] which bears significantly on the rate-of-pay issue.[30] For reasons now to be stated, we decline to give *Carbon Fuel* retroactive operation on the facts of this case.[31] We then apply the rationale of *Higgins* toward our determination on post-transfer rate of pay.[32]

## II

We first examine Mullins' thesis that in consequence of our *Carbon Fuel* decision the Board lacked power to review the notice

**21.** J.App. 20.

**22.** The notice issued pursuant to Federal Coal Mine Health and Safety Act of 1969, § 104(b), 30 U.S.C. § 814(b) (1976), providing:

Except as provided in subsection (i) of this section, if, upon any inspection of a coal mine, an authorized representative of the Secretary [of the Interior] finds that there has been a violation of any mandatory health or safety standard but the violation has not created an imminent danger, he shall issue a notice to the operator or his agent fixing a reasonable time for the abatement of the violation. If, upon the expiration of the period of time as originally fixed or subsequently extended, an authorized representative of the Secretary finds that the violation has not been totally abated, and if he also finds that the period of time should not be further extended, he shall find the extent of the area affected by the violation and shall promptly issue an order requiring the operator of such mine or his agent to cause immediately all persons, except those referred to in subsection (d) of this section, to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that the violation has been abated.

Subsections (d) and (i), 30 U.S.C. § 814(d), (i) (1976), to which the quoted material refers, have no bearing on this case. For a broader description of the statutory machinery, see *UMW v. Andrus (Carbon Fuel Co.),* supra note 1, 189 U.S.App.D.C. at 112, 581 F.2d at 890. Section 104 was extensively revised in 1977, see 30 U.S.C. § 961 (Supp. II 1978).

**23.** See note 22 *supra.*

**24.** *Pocahontas Fuel Co. v. Mining Enforcement & Safety Administration,* supra note 5, J.App. 32–33.

**25.** *Pocahontas Fuel Co.,* supra note 5.

**26.** Our jurisdiction to review the Board's decision rests upon Federal Coal Mine Health and Safety Act of 1969, § 106(a), 30 U.S.C. § 816(a) (1976); see Federal Mine Safety and Health Amendments Act of 1977, § 301(c)(4), 30 U.S.C. § 961(c)(4) (Supp. II 1978).

**27.** *Supra* note 1.

**28.** *UMW v. Andrus (Carbon Fuel Co.), supra* note 1, 113 U.S.App.D.C. at 113–116, 581 F.2d at 891–894.

**29.** *Supra* note 2.

**30.** See Part III *infra.*

**31.** Part II *infra.*

**32.** Part III *infra.*

of violation on the merits.[33] As previously indicated, *Carbon Fuel* addressed the question whether the administrative review procedures of the 1969 Act[34] permitted a ruling on the merits of a notice of violation before expiration of the period for abatement of the violation and issuance of a withdrawal order. After examination of the statutory language and its legislative history, we held that no such review was authorized "while miners continued to work in the affected area."[35]

We are greeted at the outset by the counterargument that *Carbon Fuel* has no importance in the case now before us.[36] The statutory pay-maintenance injunction, it is urged, was not a "mandatory health or safety standard" within the meaning of the 1969 Act,[37] and thus was not subject to enforcement through the mechanism of a violation notice.[38] Both the administrative law judge[39] and the Interior Board of Mine Operations Appeals[40] rejected this argument, and so do we.

The 1969 Act directed the Secretary of the Interior to develop mandatory health and safety standards for the protection of miners,[41] and that the Secretary subsequently did.[42] Additionally, the Act explicitly constituted the provisions of certain designated sections "interim mandatory health standards applicable to all underground coal mines until superseded in whole or in part by improved mandatory health standards promulgated by the Secretary,"[43] and specified that they "shall be enforced in the same manner and to the same extent as any mandatory health standard promulgated...."[44] The pay-maintenance section is included in the statutory enumeration of those to be so treated.[45] We have not been referred to, nor after a diligent search have we found, any mandatory health standard formulated by the Secretary purporting to supersede the maintenance section in any wise. On the contrary, the Secretary's regulations have expressly and consistently incorporated both the transfer and pay-maintenance provisions[46] and have called for

**33.** See Brief for Petitioner at 18–19.

**34.** See Federal Coal Mine Health and Safety Act of 1969 §§ 105(a)–(c), 30 U.S.C. §§ 815(a)–(c) (1976).

**35.** *UMW v. Andrus (Carbon Fuel Co.), supra* note 1, 189 U.S.App.D.C. at 116, 581 F.2d at 894. We noted that "Section 105(a)(1) clearly differentiated between withdrawal orders and violation notices: one affected by an order in any way could seek 'review of the order,' while one aggrieved by a violation notice could apply for review only 'if he believe[d] that the period of time fixed in the notice for abatement of the violation [was] unreasonable.'" *Id.* at 113, 581 F.2d at 891 (quoting relevant statutory language) (footnotes omitted).

**36.** See Brief for Respondent at 7–9; Brief for Intervenor at 4–5. Consolidation Coal Company, the intervenor, is the parent company of Pocahontas Fuel Company.

**37.** *See note 22 supra.*

**38.** Brief for Respondent at 7–8; Brief for Intervenor at 5 n.4.

**39.** *Pocahontas Fuel Co. v. Mining Enforcement & Safety Admin., supra* note 5, at 5, J.App. 31.

**40.** *Pocahontas Fuel Co., supra* note 5, 83 Interior Dec. at 692–693.

**41.** Federal Coal Mine Health and Safety Act of 1969, § 101, 30 U.S.C. § 811 (1976).

**42.** See 30 C.F.R. §§ 70.100 *et seq.* (1979).

**43.** "The provisions of sections 202 through 206 of this title and the applicable provisions of section 318 of title III shall be interim mandatory health standards applicable to all underground coal mines until superseded in whole or in part by improved mandatory health standards promulgated by the Secretary under the provisions of section 101 of this Act, and shall be enforced in the same manner and to the same extent as any mandatory health standard promulgated under the provisions of section 101 of this Act...." Federal Coal Mine Health and Safety Act of 1969, § 201(a), 30 U.S.C. § 841(a) (1976).

**44.** See note 43 *supra.*

**45.** The pay-maintenance provision, Federal Coal Mine Health and Safety Act of 1969, § 203(b)(3), 30 U.S.C. § 843(b)(3) (1976), clearly falls within the purview of Section 201(a), quoted in relevant part *supra* note 43.

**46.** See 30 C.F.R. §§ 90.1–90.40 (1979). Aside from minor changes in nomenclature, these regulations have subsisted since 1971. See 36 Fed.Reg. 20600, 20601–20602, 20696 (1971).

their enforcement through the notice-of-violation procedure.[47] It follows that any transgression of the pay-maintenance mandate presented an occasion fully appropriate for issuance of a violation notice. And while with statutory language so clear we need not look further for guidance,[48] we note that the legislative history unmistakably supports this result.[49]

The more troublesome question is whether our holding in *Carbon Fuel* governs the situation at hand and compels us to set the Board's decision aside. The administrative law judge reviewed the merits of the violation notice during the abatement period and before any withdrawal order issued;[50] the Board, affirming the judge's outcome, upheld the timing of his exercise of that jurisdiction.[51] We think *Carbon Fuel* has no proper role in the special circumstances here.

We realize, of course, that judicial decisions normally are to be applied retroactively.[52] Cases pending when prior law is judicially altered ordinarily are to be adjudged by the revised standard[53]—whether the change was constitutional, statutory or ju-

**47.** "If [an] inspection and investigation shows noncompliance with section 203 of the Act, the District Manager shall make or cause to be made appropriate findings, notices, and orders under section 104 of the Act. In no case shall a reasonable time for abatement of a violation be more than 30 days from the date of the notice of violation." 30 C.F.R. § 90.40(b) (1979). See note 46 *supra.*

**48.** *E. g., Banks v. Chicago Grain Trimmers Ass'n,* 390 U.S. 459, 465, 88 S.Ct. 1140, 1144, 20 L.Ed.2d 30, 36 (1968); *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442, 453 (1917).

**49.** Since it is arguable that a minimum pay level—as opposed to a dust level, see Federal Coal Mine Health and Safety Act of 1969, § 202, 30 U.S.C. § 842 (1976)—is not health-related, we have searched for pertinent congressional intent. See, *e. g., Portland Cement Ass'n v. Ruckelshaus,* 158 U.S.App.D.C. 308, 312–313 & n.13, 486 F.2d 375, 379–380 & n.13 (1973), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974). The legislative history of the pay-maintenance section discloses unambiguously Congress' firm resolve that miners contracting black lung disease were not to be discouraged from health-saving transfers by fear of an ensuing reduction in pay. S.Rep.No. 411, 91st Cong., 1st Sess. 50 (1969), *reprinted in* House Committee on Education and Labor, Legislative History of the Federal Coal Mine Health and Safety Act [of 1969], 91st Cong., 2d Sess. 49 (Comm. Print 1970) [hereinafter cited as *Legislative History*]. See also H.R.Rep.No. 563, 91st Cong., 1st Sess. 40–41 (1969), *reprinted in* [1969] U.S.Code Cong. & Adm.News 2503, 2544–2545, and *reprinted in Legislative History, supra,* at 598–599. Like the statutory section requiring chest x-rays for miners, Federal Coal Mine Health and Safety Act of 1969, § 203(a), 30 U.S.C. § 843(a) (1976), the transfer provision was deemed "equal in importance to the dust control section for decreasing the incidence and development of pneumoconiosis" by the House committee responsible for the legislation. *Leg-islative History, supra,* at 725 (remarks of Representative Dent); H.R.Rep.No.563, *supra,* at 20, *reprinted in* [1969] U.S.Code Cong. & Ad. News, *supra* at 2522–2523, and in *Legislative History, supra,* at 577. We read the pay-maintenance provision in relation to the transfer provision to which it was attached, for "[i]t is well established that our task in interpreting separate provisions of a single Act is to give the Act 'the most harmonious, comprehensive meaning possible' in light of the legislative policy and purpose." *Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 631–632, 93 S.Ct. 2469, 2484, 37 L.Ed.2d 207, 224 (1973), quoting *Clark v. Uebersee Finanz-Korp.,* 332 U.S. 480, 488, 68 S.Ct. 174, 178, 92 L.Ed. 88, 94 (1947). See *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 591–592, 7 L.Ed.2d 492, 499 (1962) ("[w]e believe it fundamental that a section of a statute should not be read in isolation from the context of the whole Act"). We are convinced that Congress intended both provisions to be enforceable as health standards, and we reject the argument to the contrary.

**50.** See *Pocohontas Fuel Co. v. Mining Enforcement & Safety Admin., supra* note 5, at 1, J.App. 27.

**51.** *Pocahontas Fuel Co., supra* note 5, 83 Interior Dec. at 692–693.

**52.** See cases cited *infra* note 53.

**53.** *Cort v. Ash,* 422 U.S. 66, 76–77, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26, 35 (1975); *Bradley v. School Bd.,* 416 U.S. 696, 711–712, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476, 488 (1974); *Thorpe v. Housing Auth.,* 393 U.S. 268, 281–282, 89 S.Ct. 518, 526, 21 L.Ed.2d 474, 484 (1969); *Linkletter v. Walker,* 381 U.S. 618, 622–629, 85 S.Ct. 1731, 1734–1738, 14 L.Ed.2d 601, 604–608 (1965); *United States v. Schooner Peggy,* 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49, 51 (1801); Note, *Prospective Overruling and Retroactive Application in the Federal Courts,* 71 Yale L.J. 907 (1962).

dicial in character,[54] and regardless of whether the intervening legal doctrine was expressly made applicable to such cases.[55] The rule is not absolute, however, and oft-times judicial pronouncements, even on noncriminal subjects, have been denied retrospective operation.[56]

In *Chevron Oil Co. v. Huson*,[57] the Supreme Court offered valuable guidance in this area by identifying three factors generally to be considered in dealing with problems of retroactivity:

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed.... Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." .... Finally, we have weighed the inequity imposed

by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity." [58]

It goes without saying that *Carbon Fuel* is not to be utilized indiscriminately, but only after adequate evaluation of these factors as they may bear relevance in the particular case.

To begin with, *Carbon Fuel* not only addressed a question of first impression in this court but it also overturned the agency's construction of the 1969 Act's administrative-review provisions. The Department of the Interior had theretofore proceeded on the assumption that at least to some extent a notice of violation could permissibly be examined on its merits before promulgation of a withdrawal order.[59] Casual statements in two judicial opinions arguably implied the validity of that practice,[60] and two other opinions, without close analysis, seemingly had accepted it [61]—references which in *Car-*

**54.** *Thorpe v. Housing Auth., supra* note 53, 393 U.S. at 282, 89 S.Ct. at 526, 21 L.Ed.2d at 484, and cases cited in notes 40–42 thereof.

**55.** In *Bradley v. School Bd., supra* note 53, the Court followed *Thorpe v. Housing Auth., supra* note 53, in holding "that even where the intervening law does not explicitly recite that it is to be applied to pending cases, it is to be given recognition and effect." 416 U.S. at 715, 94 S.Ct. at 2018, 40 L.Ed.2d at 490 (footnote omitted). The Court accordingly "reject[ed] the contention that a change in the law is to be given effect in a pending case only where that is the clear and stated intention of the legislature." *Id.* (footnote omitted). The Court cautioned, however, that "neither our decision in *Thorpe* nor our decision today purports to hold that courts must always thus apply new laws to pending cases in the absence of clear legislative direction to the contrary...." *Id.* (footnote omitted).

**56.** See *Chevron Oil Co. v. Huson*, 404 U.S. 97, 105–106, 108, 92 S.Ct. 349, 354–355, 356, 30 L.Ed.2d 296, 304–305, 306–307 (1971), and authorities there cited.

**57.** *Supra* note 56.

**58.** 404 U.S. at 106–107, 92 S.Ct. at 355, 30 L.Ed.2d at 306 (citations omitted). Compare *Cort v. Ash, supra* note 53, 422 U.S. at 77, 95

S.Ct. at 2087, 45 L.Ed.2d at 35–36; *Bradley v. School Bd., supra* note 53, 416 U.S. at 716–717, 94 S.Ct. at 2018–2019, 40 L.Ed.2d at 490–491; *Thorpe v. Housing Auth., supra* note 53, 393 U.S. at 282, 89 S.Ct. at 526, 21 L.Ed.2d at 484. We ourselves have admonished that "[r]etroactivity is the rule, but not at the expense of other important values," *Zweibon v. Mitchell*, 196 U.S.App.D.C. 265, 270, 606 F.2d 1172, 1177 (footnote omitted), such as "[t]he impact of retroactive application of the new rule, both on litigants and on the administration of justice as a whole." *National Ass'n of Broadcasters v. FCC*, 180 U.S.App.D.C. 259, 272, 554 F.2d 1118, 1131 (1976) (emphasis omitted).

**59.** The agency had relied upon *Freeman Coal Mining Corp.*, 77 Interior Dec. 149 (1970). See *UMW v. Andrus (Carbon Fuel Co.), supra* note 1, 189 U.S.App.D.C. at 115, 581 F.2d at 893.

**60.** See *UMW v. Andrus (Carbon Fuel Co.), supra* note 1, 189 U.S.App.D.C. at 115–116 n.50, 581 F.2d at 893–894 n.50, referring to *National Independent Coal Operators' Ass'n v. Kleppe*, 423 U.S. 388, 391, 96 S.Ct. 809, 811, 46 L.Ed.2d 580, 584 (1976); *Kanawha Coal Co. v. Andrus*, 553 F.2d 361, 363 (4th Cir. 1977).

**61.** See *UMW v. Andrus (Carbon Fuel Co.), supra* note 1, 189 U.S.App.D.C. at 115–116 n.50, 581 F.2d at 893–894 n.50, referring to *Lucas*

*bon Fuel* we found unconvincing.[62] There was nothing of which we have become aware that might have served as an omen of the new interpretation that *Carbon Fuel* was to inaugurate.[63]

Nor is retroactive application of *Carbon Fuel* counseled when we balance the pros and cons of the present case in accordance with *Chevron Oil's* second criterion. Our study in *Carbon Fuel* of the text and legislative history of the 1969 administrative-review provisions netted a congressional purpose to bar the frequently lengthy merits review of a violation notice at a time when miners remained exposed to conditions possibly violative of the Act's mandatory health or safety standards.[64] That objective cannot be served by imparting retrospectivity to *Carbon Fuel* here. Mullins has transferred from his post at the mineface.[65] There are no other cases pending under the 1969 notice-review provisions.[66] New statutory machinery for present and future enforcement of the standards is in place.[67] The Act's health-saving mission would not be furthered by insistence upon compliance herein with the old violation-notice procedure.

The case against retroactivity becomes even clearer when we consider the third *Chevron Oil* factor—the "injustice or hardship" of such an application. Both, we believe, would be almost inevitably the consequences here. At stake is the meaning of a statutory provision—the pay-maintenance mandate—not heretofore construed definitively for situations of the type confronting us. That question has already once run the gamut of administrative consideration, and is here for authoritative solution by the court. A remand of the problem simply because of prematurity of the Board's decision would risk not only a mere duplication of the administrative interpretation but also a need for the parties to return here for this court's view. That sort of delay could hardly benefit the litigants; more importantly, it would run counter to the announced statutory goal of urgently-needed protection for an untold number of miners who, unlike Mullins, have yet to make up their own minds on position transfer.[68]

*Coal Co. v. Interior Bd. of Mine Operations Appeals,* 522 F.2d 581, 587 (3d Cir. 1975); *Lucas v. Morton,* 358 F.Supp. 900, 903–904 (W.D. Pa.1973) (3-judge court).

**62.** *UMW v. Andrus (Carbon Fuel Co.), supra* note 1, 189 U.S.App.D.C. at 115–116 n.50, 581 F.2d at 893–894 n.50.

**63.** Compare *Chevron Oil Co. v. Huson, supra* note 56, 404 U.S. at 107, 92 S.Ct. at 356, 30 L.Ed.2d at 306.

**64.** *UMW v. Andrus (Carbon Fuel Co.), supra* note 1, 189 U.S.App.D.C. at 116, 581 F.2d at 892.

**65.** See text *supra* at note 19.

**66.** See Memorandum of Secretary of Interior in Opposition to Petition for Writ of Certiorari at 6, *Carbon Fuel Co. v. Andrus,* 439 U.S. 928, 99 S.Ct. 313, 58 L.Ed.2d 321 (1978).

**67.** See note 22 *supra.*

**68.** "Congress declares that—(a) the first priority and concern of all in the coal mining industry must be the health and safety of its most precious resource—the miner; ... (c) there is an urgent need to provide more effective means and measures for improving the working conditions and practices in the Nation's coal mines

in order to prevent death and serious physical harm, and in order to prevent occupational diseases originating in such mines...." Federal Coal Mine Health and Safety Act of 1969, § 2(a), (c), 30 U.S.C. § 801(a), (c) (1976). See also *National Independent Coal Operators' Ass'n v. Kleppe, supra* note 60, 423 U.S. at 398–399, 96 S.Ct. at 814–815, 46 L.Ed.2d at 588–589 (1976); *Munsey v. Federal Mine Safety & Health Review Comm'n,* 193 U.S.App.D.C. 350, 368–369, 595 F.2d 735, 742–743 (1978); *District 6, UMW v. Department of Interior Bd. of Mine Operations Appeals,* 183 U.S.App.D.C. 312, 317, 562 F.2d 1260, 1265 (1977); *Zeigler Coal Co. v. Kleppe,* 175 U.S.App.D.C. 371, 381–382, 536 F.2d 398, 408–409 (1976); *UMW v. Kleppe,* 174 U.S.App.D.C. 328, 330–331, 532 F.2d 1403, 1405–1406, *cert. denied,* 429 U.S. 858, 97 S.Ct. 157, 50 L.Ed.2d 135 (1976); *Phillips v. Interior Bd. of Mine Operations Appeals,* 163 U.S.App.D.C. 104, 114, 500 F.2d 772, 782 (1974), *cert. denied,* 420 U.S. 938, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975); *Rushton Mining Co. v. Morton,* 520 F.2d 716, 720 (3d Cir. 1975); *Reliable Coal Corp. v. Morton,* 478 F.2d 257, 262 (4th Cir. 1973); *Morris v. Mathews,* 557 F.2d 563, 570 (6th Cir. 1977); *Freeman Coal Mining Co. v. Interior Bd. of Mine Operations Appeals,* 504 F.2d 741, 744 (7th Cir. 1974); *Paluso v. Mathews,* 562 F.2d 33, 36 (10th Cir. 1977); text *infra* at notes 96–100.

On past occasions, when a decision of the court has drastically affected the nature of administrative proceedings, we have declined to apply the newly-announced procedural rule to pending cases if to do so would result in substantial injustice.[69] And when, as here, the issue prompting an appeal likely would not be finally settled on a remand, but only pretermitted for judicial treatment after completion of repetitive administrative proceedings, we see no reason to embrace retroactivity.[70]

### III

The several events precipitating the rate-of-pay controversy may usefully be recounted. Though hired at the Maitland Mine as a general interior laborer, for five months Mullins served variously in that capacity and—predominantly—as a roof bolter, at the rates of compensation respectively established for those types of work.[71] Then,

as a victim of black lung disease, Mullins exercised his statutory option to transfer to another position in a more favorable atmosphere of the mine,[72] and thus became entitled to "receive compensation for [his post-transfer] work at not less than the regular rate of pay received by him immediately prior to his transfer."[73] The question is whether Mullins' post-transfer wage rate was to be pegged at the level accorded his job classification, or rather at some higher level dictated by the amount he actually earned.

The administrative law judge, concerned by a need to ascertain such a miner's post-transfer rate of pay on the basis of the percentage of time the miner devoted to varying pre-transfer work assignments,[74] concluded that a "transfer[ring] miner is entitled to receive the rate of pay to which he had a *right* immediately prior to his transfer,"[75] which in Mullins' instance was

69. See *Action for Children's Television, Inc. v. FCC*, 183 U.S.App.D.C. 437, 453, 564 F.2d 458, 474 (1977), and *Hercules, Inc. v. EPA*, 194 U.S. App.D.C. 172, 207–208, 598 F.2d 91, 126–127 (1978) refusing automatic application of legal rules newly laid down in *Home Box Office, Inc. v. FCC*, 185 U.S.App.D.C. 142, 190, 567 F.2d 9, 57, *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977), to cases pending when *Home Box Office* was decided.

70. Should one wonder why *Carbon Fuel* was not itself limited to prospective operation, the short answer is that no issue of retroactivity was there raised.

71. See text *supra* at notes 15–17.

72. See text *supra* at note 18.

73. See text *supra* at note 4.

74. See text *infra* at notes 108–112.

75. The administrative law judge said:
 If Mr. Mullins had not elected to be transferred at this time, and had continued to work in the face area for another year, there would have been no obligation upon [the mine operators'] part to employ him or pay him at any higher rate than that of an inside laborer unless, within that time, he applied and qualified under the contract provisions, for a higher paying position. Nor would there have been any obligation to continue to employ him on a temporary basis as a roof bolter. And if at the end of a solid year of employment as an inside laborer he had been

transferred away from the face area there would hardly be any doubt that he was entitled, after the transfer, only to the wages of an inside laborer. The difference between that situation and the situation in the instant case is caused by the proximity of the temporary roof bolter employment to the date of the transfer as well as to the extent of such employment. Mr. Mullins spent approximately 70 percent of his working time at the Maitland Mine in the position of a temporary roof bolter. But suppose a fellow employee, also classified as a general inside laborer, spent 30 percent of his working time as a temporary roof bolter and had not done any temporary roof bolting in the two or three months immediately preceding a transfer on June 17. Should such a worker be treated differently than Mr. Mullins? More extreme examples could be given in both directions, but the question presented is whether the Department of Interior is required to decide such questions, based on such factors as the percentage of time spent in the higher paying occupation and the proximity of the temporary employment to the transfer date. If we are called upon to make a distinction and draw a line somewhere between the worker who has spent 100 percent of his time in a temporary job and another who had spent only one percent of his time in such a job, then the Department's inspectors would have to exercise wisdom far in excess of their training in determining whether or not to issue notices of violation. In my judgment, that is not the type of situation where a

the rate of a general interior laborer.[76] The Board arrived at the same result, but by an entirely different course of reasoning.[77] The Board noted that "[d]uring the approximate 5-month period of Mullins' employment in the Maitland Mine, there were five permanent roof bolter positions advertised, one of which (Apr. 2, 1974) went unfilled because there were no applicants."[78] The Board further noted that "[o]n May 28, 1974 (more than 2 weeks after the operator had been advised by [the Mining Enforcement and Safety Administration] of Mullins' election to transfer to a non-face occupation), three additional permanent roof bolter positions were advertised;"[79] and that although Mullins bid on one of these latter openings, he "was unsuccessful because another applicant had seniority rights over him."[80] Based on these developments, the Board concluded that

> had Mullins been desirous of gaining a position in the Maitland Mine as a permanent roof bolter there were ample opportunities for him to make his intentions known. The facts further demonstrate that had Mullins been desirous of a per-

manent roof bolter position and had he bid on the Apr. 2, 1974 position, he would have been successful. It appears that only after he had elected to transfer to a non-face occupation in the mine did he make his desire for a permanent roof bolter position known.

The Board is of the opinion that this miner, having rejected the opportunity to obtain a permanent position of roof bolter commanding a higher rate of pay than his job classification as an inside laborer would support, should not now be entitled to the rights of a permanent roof bolter to be transferred with him to a non-face occupation in the mine.[81]

When reviewing factual determinations made administratively under the Act, we apply the substantial evidence test;[82] agency findings of that character are conclusive if supported, on the record considered as a whole, by evidence possessing that value.[83] Questions of law, on the other hand, are ultimately for the courts to resolve.[84] To be sure, we accord considerable

---

> notice of violation, enforced by a subsequent withdrawal order and civil penalty proceeding is appropriate. A health or safety standard must be precise and I interpret the section in question to mean that the transferred miner is entitled to receive the rate of pay to which he had a *right* immediately prior to his transfer.
>
> Insofar as this record shows, Mr. Mullins had no right to be employed as a temporary roof bolter and would have had no grievance if he had been employed for only 20 hours or not at all, in the higher paying position rather than the 496 hours he actually worked in that position. There has been no contention that Mr. Mullins should have been classified as a roof bolter, nor that there was any violation of the union contract in hiring such permanent roof bolters as were hired. It is my holding that unless Mr. Mullins was wrongly classified and thus had a right to a roof bolting job, a violation of the health standard involved here has not occurred.
>
> *Pocahontas Fuel Co. v. Mining Enforcement & Safety Admin., supra* note 5, at 6–7, J.App. 32–33 (emphasis in original).

**76.** See note 75 *supra*.

**77.** *Pocahontas Fuel Co., supra* note 5, 83 Interior Dec. at 694.

**78.** *Id.*

**79.** *Id.*

**80.** *Id.*

**81.** *Id.* (footnote omitted).

**82.** Federal Coal Mine Health and Safety Act of 1969, § 106(b), 30 U.S.C. § 816(b) (1976); *Old Ben Coal Corp. v. Interior Bd. of Mine Operations Appeals*, 523 F.2d 25, 33 (7th Cir. 1975).

**83.** Compare *Consolo v. FMC*, 383 U.S. 607, 618–620, 86 S.Ct. 1018, 1025–1026, 16 L.Ed.2d 131, 139–141 (1966); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–465, 95 L.Ed. 456, 467–468 (1951); *May Trucking Co. v. United States*, 193 U.S.App.D.C. 195, 198, 593 F.2d 1349, 1352 (1979).

**84.** See *NLRB v. Enterprise Ass'n, Local 638*, 429 U.S. 507, 522 n.9, 97 S.Ct. 891, 900 n.9, 51 L.Ed.2d 1, 15 n.9 (1977); *NLRB v. Waterman S.S. Corp.*, 309 U.S. 206, 208, 60 S.Ct. 493, 496, 84 L.Ed. 704, 707 (1940); *FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 144–145, 60 S.Ct. 437, 442, 84 L.Ed. 656, 663 (1940); *E. Anthony & Sons, Inc. v. NLRB*, 82 U.S.App. D.C. 249, 251, 163 F.2d 22, 24, cert. denied, 332 U.S. 773, 68 S.Ct. 89, 92 L.Ed. 358 (1947).

deference to an agency's construction of its governing statute,[85] but "this principle has no application where ... the agency has misinterpreted its statutory mandate. In such cases of misinterpretation, it is our duty to correct the legal error of the agency."[86] Here, the Board's decision was predicated upon a construction of the pay-maintenance provision that clashes with its interpretation by this court and, as well, with a fundamental purpose of the Act.

Two years ago, in *Higgins v. Marshall*,[87] a panel majority held that a transferring miner could not claim post-transfer wage increases periodically accruing within his pre-transfer job classification. The miner-appellants there argued that the rate of pay statutorily demanded upon transfer is the miner's job-classification rate rather than his dollar rate[88]—"that the rate of pay is tied to the position rather than to a dollar amount received immediately prior to transfer."[89] Over a dissent vigorously espousing this reading,[90] the majority found the language of the pay-maintenance section "simple and straightforward: a transferring miner is not to receive less compensation than he would have received had he not

transferred, that is, not less than the monetary amount he is receiving 'immediately prior to transfer.'"[91] From the legislative history the majority gleaned "nothing to indicate that Congress meant to tie the compensation protection to the pay rate received by miners in the pre-transfer classification;"[92] "[t]o so hold," the majority declared, "would be to distort the clear meaning of the words of the statute."[93]

While the *Higgins* court did not face the precise issue before us here, its construction of the governing statutory provision binds us to a holding that a transferring miner takes with him his regular dollar rate of pay, and not the job-classification rate for his vacated position, if the rate for the new position is lower.[94] This means, of course, that Mullins' entitlement was the rate of compensation he actually and regularly received immediately prior to his transfer, and not the lower rate of a general inside laborer. And there is more than just our obligation to honor *Higgins* to steer us to the same conclusion.

Courts must liberally construe remedial statutes in furtherance of enunciated legis-

---

85. *Griggs v. Duke Power Co.*, 401 U.S. 424, 433–434, 91 S.Ct. 849, 854–855, 28 L.Ed.2d 158, 165 (1971); *United States v. City of Chicago*, 400 U.S. 8, 10, 91 S.Ct. 18, 20, 27 L.Ed.2d 9, 12–13 (1970); *Udall v. Tallman*, 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616, 619 (1965); *Zeigler Coal Co. v. Kleppe, supra* note 68, 175 U.S.App.D.C. at 382, 536 F.2d at 409.

86. *Association of Am. R.Rs. v. Costle*, 183 U.S. App.D.C. 362, 370–371, 562 F.2d 1310, 1318–1319 (1977) (footnote omitted). See, *e. g.*, *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 94–95, 94 S.Ct. 334, 339–340, 38 L.Ed.2d 287, 294–295 (1973); *FMC v. Seatrain Lines, Inc.*, 411 U.S. 726, 745, 93 S.Ct. 1773, 1785, 36 L.Ed.2d 620, 633–634 (1973); *National Wildlife Fed'n v. Snow*, 182 U.S.App.D.C. 229, 294–295, 561 F.2d 227, 238–239 (1976); *National Ass'n of Regulatory Util. Comm'rs v. FCC*, 174 U.S.App.D.C. 374, 391, 533 F.2d 601, 618 (1976).

87. *Supra* note 2.

88. 190 U.S.App.D.C. at 56, 584 F.2d at 1037.

89. *Id.*

90. *Id.* at 58–63, 584 F.2d at 1039–1044. The dissent stressed the statement in the 1969 Conference Report that "the managers intend that

the act be construed liberally when improved health or safety to miners will result," *id.* at 58, 584 F.2d at 1039, quoting H.R.Rep. No. 761, 91st Cong., 1st Sess. 63 (1969), reprinted in *Legislative History, supra* note 49, at 1025, and urged that the pay-maintenance section should be read broadly to permit a transferring miner to receive post-transfer periodic wage increases appurtenant to the position he held before transfer. *Id.* at 58, 584 F.2d at 1039. Our decision squares both with the *Higgins* majority's interpretation of the pivotal section and with the dissent's emphasis on the Act's overall purpose.

91. *Id.* at 56, 584 F.2d at 1037 (quoting the pay-maintenance provision).

92. *Id.* at 57, 584 F.2d at 1038.

93. *Id.*

94. Reversal of a panel decision will be undertaken in this circuit only by the court *en banc. United States v. Caldwell*, 178 U.S.App.D.C. 20, 57 & n.19, 543 F.2d 1333, 1369 & n.19 (1974), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976), and authorities there collected.

lative goals,[95] and those who finalized the 1969 Act expected no less. The Conference Report expressly made known that "the managers intend that the Act be construed liberally when improved health or safety to miners will result."[96] Congress declared that the primary aim of the Act was to foster "the health and safety of [the coal industry's] most precious resource—the miner."[97] We in turn must give the pay-maintenance mandate an interpretation promoting that end.

In utilizing the *Higgins* majority's construction as the premise for holding that the transferring miner's due is his regular dollar rate of pay, we adhere not only to precedent but also to the objective Congress had foremost in mind when it gave the Act birth. The *Higgins* majority stated the obvious when it observed that "by not having to take a pay cut upon transfer to a position which would ordinarily pay less, the miner is more likely to transfer to protect his health than he would be otherwise."[98] The incentive to transfer would be dampened, if indeed not seriously depressed, were miners with actual earnings above their classification rates required to drop back to their classification levels.

The text of the Act's pay-maintenance requirement, and as well its legislative history, make crystal clear the will of Congress that a miner not be forced to endure a reduction in his accustomed rate of remuneration upon exercising his statutory right to transfer.[99] We have encountered nothing indicative of a purpose to roll a transferring miner back to his classification rate when his pre-transfer dollar rate is more. As the case at bar illustrates, the pay rate for a miner's particular job classification and his actual pay rate do not always coincide, and we are unwilling to presume that Congress was unaware of that. Nor are we disposed to undermine the beneficent effect of this legislation by adopting a repressive interpretation "that nowhere appears in the Act, that was never mentioned by Congress during the legislative process, that does not comport with the Congress' intent, and that restricts the coverage of a remedial Act."[100]

In this view of the pay-maintenance section, we find unacceptable the Board's holding that Mullins' claim was foreclosed by his failure to seek permanent assignment as a roof bolter.[101] In the first place, the Board disregarded both the language and

---

**95.** *Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 268, 97 S.Ct. 2348, 2359, 53 L.Ed.2d 320, 355 (1977) (Longshoremen's and Harbor Workers' Compensation Act); *Baltimore & Philadelphia Steamboat Co. v. Norton,* 284 U.S. 408, 414, 52 S.Ct. 187, 189, 76 L.Ed. 366, 370 (1932) (same); *Jamison v. Encarnacion,* 281 U.S. 635, 640, 50 S.Ct. 440, 442, 74 L.Ed. 1082, 1086 (1930) (Federal Employers' Liability Act); *United States v. Anderson,* 76 U.S. (9 Wall.) 56, 65–66, 19 L.Ed. 615, 617 (1869) (Abandoned Property Collection Act of 1863). That the Federal Coal Mine Health and Safety Act of 1969 is such a law is beyond cavil. See *Usery v. Turner Elkhorn Mining Co.,* supra note 2, 428 U.S. at 5–38, 96 S.Ct. at 2888–2903, 49 L.Ed.2d at 760–779, and cases collected *supra* note 68.

**96.** H.R.Rep. No. 761, 91st Cong., 1st Sess. 63 (1969), *reprinted in* [1969] U.S.Code Cong. & Ad.News 2578, and in *Legislative History, supra* note 49, at 1025.

**97.** See note 68 *supra.*

**98.** *Higgins v. Marshall, supra* note 2, 190 U.S. App.D.C. at 57, 584 F.2d at 1038.

**99.** See *Legislative History, supra* note 49, at 695.

**100.** *P. C. Pfeiffer Co. v. Ford,* 444 U.S. 69, 76, 100 S.Ct. 328, 334, 62 L.Ed.2d 225, 232 (1979), quoting *Northeast Marine Terminal Co. v. Caputo, supra* note 95, 432 U.S. at 278–279, 97 S.Ct. at 2365, 53 L.Ed.2d at 342.

**101.** See text *supra* at notes 78–81. The subject of our review, of course, is the Board's and not the administrative law judge's decision. And in testing the validity of the Board's disposition, we are confined to the rationale supplied by the Board itself. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 285–286, 95 S.Ct. 438, 441–442, 42 L.Ed.2d 447, 455–456 (1974); *Texas Gas Transmission Corp. v. Shell Oil Co.,* 363 U.S. 263, 270, 80 S.Ct. 1122, 1126–1127, 4 L.Ed.2d 1208, 1213 (1960); *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995, 1999 (1947); *SEC v. Chenery Corp.,* 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626, 633 (1943).

the purpose of the Act when it ascribed decisional importance to the fact that Mullins did not apply for either of the roof bolter positions available before he made known his desire to transfer.[102] The statutory right to pay maintenance is an inseparable incident of the statutory right to transfer;[103] for miners afflicted by black lung disease, each right is indefeasible and unqualified.[104] The Board cannot take away an ailing miner's prerogative to transfer, and no more can it condition the pay-maintenance protection statutorily accompanying exercises of the transfer privilege. In denying Mullins his regular dollar rate simply because he had not sought to perpetuate that rate through elevation to a permanent roof-bolting job, the Board conjured up a prerequisite that Congress had not seen fit to interpose.[105]

The Board's additional focus on Mullins' similar behavior after his election to transfer encounters even further difficulty. The pay-maintenance section was designed to promote health-conserving transfers by eliminating fear of adverse economic consequence.[106] That section defies a construction that would visit that very consequence upon a miner for failure to vie for a mine-face job after he has already opted to transfer to a nonface position.[107] The right to

transfer ·becomes absolute when a miner properly invokes it, and simultaneously the right to continuance of his level of pay accrues. No more is required of the miner to preserve either.[108]

Acceptance of Mullins' position, we realize, will necessitate factual ascertainment in situations like his of just what a transferring miner's "regular rate of pay" really is "immediately prior to transfer."[109] We have not lost sight of the administrative law judge's observation that federal mine inspectors are not qualified to make such determinations when the miner has discharged pre-transfer work assignments in more than one pay category.[110] We are not favored by an explanation of why, but in any event that perceived difficulty cannot justify use of the classification rate of pay as the "regular rate of pay." We must reject a statutory interpretation—and surely one merely serving administrative convenience—when it flouts a legislative edict.[111] Whatever the capabilities of mine inspectors themselves, certainly the Department of the Interior is equipped to make the necessary calculations, and in our view is required by the Act to do so. The Department is not at liberty to sidestep this statutory responsibility simply because "line drawing"[112] may sometimes involve meticu-

**102.** See text *supra* at note 81.

**103.** See text *supra* at note 4.

**104.** See Federal Coal Mine Health and Safety Act of 1969, §§ 202(b)(2), (3), 30 U.S.C. §§ 843(b)(2), (3) (1976), respectively quoted in relevant part *supra* note 3 and text at note 4.

**105.** The Board hints at possible unfairness to the employer if Mullins is allowed more than his classification rate of pay. It suffices merely to observe that it was the employer who assigned Mullins to higher-paying roof-bolting activity more than 70 percent of his working time at the Maitland Mine.

**106.** See text *supra* at notes 98–99.

**107.** We are mindful that Mullins applied for a roof-bolting position opening after he had exercised his election to transfer. We deem this ambivalence irrelevant. To transfer or not was the statutory right of Mullins alone, and he was

free to consider waiving the right if he pleased. And since Mullins' application was unsuccessful, there was no such waiver and consequently no effect on the claim he now asserts.

**108.** "In order for an agency interpretation to be granted deference, it must be consistent with the congressional purpose." *Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270, 295 (1974); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371, 384 (1969); *Association of Am. R.Rs. v. Costle, supra* note 86, 183 U.S.App.D.C. at 370–371, 562 F.2d at 1318–1319.

**109.** See text *supra* at note 4.

**110.** See note 75 *supra.*

**111.** See cases cited *supra* note 86.

**112.** See note 75 *supra.*

lous mathematical computations, and perhaps even hard choices.[113]

We hold that the phrase "regular rate of pay" in the pay-maintenance section means the rate at which the transferring miner was actually and regularly compensated when the transfer occurred.[114] It follows that the Board erred as a matter of law in confining Mullins' post-transfer compensation to the pay rate applicable to general inside laborers. As a miner exercising his statutory right to transfer to a new position in the Maitland Mine, Mullins became legally entitled to compensation for his post-transfer work at not less than the rate at which he was actually and regularly paid immediately prior to transfer.[115] We reverse the order under review and remand the case to the Secretary[116] for computation of the amount accordingly due Mullins.[117]

*So ordered.*

ROBB, Circuit Judge, concurring:

I concur in Judge Robinson's opinion. At the time of Mullins' transfer and during more than 70% of the five months preceding that date he worked and was paid for as a roof bolter. In view of those facts I think it would be unrealistic to hold that "the regular rate of pay received by him immediately prior to his transfer" was that of a general inside laborer.

**113.** The Secretary acknowledges that there is no question of bad faith on Mullins' part. Brief for Respondent at 13. Our decision today does not foreclose denial of a higher rate of pay when a miner attempts to abuse the intent of the Act—for example, by working one day in a temporary position and then transferring.

**114.** The Board disallowed Mullins' bid because it felt that he was "not . . . entitled to the rights of a permanent roof bolter to be transferred with him. . . ." See text *supra* at note 81. We do not say that Mullins' right is necessarily to a roof bolter's rate of pay; it is, rather to at least the "regular [dollar] rate of pay received by him immediately prior to his transfer." See text *supra* at note 4. Certainly that is more than the classification rate, but just how much more remains to be seen. See note 117 *infra*.

**115.** See text *supra* at note 4.

**116.** In 1977, Congress transferred the administrative-review function in cases of this type to the Federal Mine Safety and Health Review Commission. Federal Mine Safety and Health Act of 1977, § 201, 91 Stat. 1305, 30 U.S.C. § 815(d) (Supp. II 1978), amending Federal Coal Mine Health and Safety Act of 1969, § 105(d), 30 U.S.C. § 815(d) (1976). While our remand is technically to the Secretary, further proceedings to comply with this opinion will automatically take place before the Commis-

sion. See Federal Mine Safety and Health Amendments Act of 1977, § 301(c)(3), 30 U.S.C. § 961(c)(3) (Supp. II 1978).

**117.** The occasion for remand is not a need for additional evidence or factfinding. The difficulty is that the statutory terminology must be given greater definition before Mullins' post-transfer pay-rate can be set. The pay-maintenance section of the Act conferred upon Mullins the right to "receive compensation for" his post-transfer labors "at not less than the regular rate of pay received by him immediately prior to his transfer." See text *supra* at note 4. In Mullins' circumstances—pay at two different rates at different times before transfer—neither the period which is to be deemed "immediately prior to the transfer" nor "the regular rate of pay received" during that period is a concept precise enough to enable us, without more, to fix the amount due. These interstices in the statutory formula must first be filled, and that, at least in the first instance, is peculiarly an administrative function. *Zuber v. Allen*, 396 U.S. 168, 192, 90 S.Ct. 314, 327, 24 L.Ed.2d 345, 360 (1969); *Marshall v. Burlington N., Inc.*, 595 F.2d 511, 513 (9th Cir. 1979); *California Co. v. Udall*, 111 U.S.App.D.C. 262, 266, 296 F.2d 384, 388 (1961). And see 30 U.S.C. § 957 (1976) (granting authority to issue regulations to carry out the provisions of the Act).